Moss, Judge,
delivered the opinion of the court:
Following certain negotiations between plaintiff company and representatives of the Government, a contract was entered into on December 31, 1917, by and between plaintiff and the Government, under the terms of which plaintiff agreed to manufacture and deliver to defendant 4,000,000 complete rounds of 75 m/m high-explosive shells, on the basis of cost, plus a variable profit, dependent upon the actual cost of the work. Plaintiff was to deliver 100,000 shells in February, 1918, and thereafter in certain specified increasing quantities each month until the month of August, 1918, when the contract was to be completed and the final deliveries made. The defendant was to furnish all the raw material and pay the entire cost of manufacture estimated at $8.18 per shell as profit. It was provided that if the actual cost exceeded $8.18 a reduction would be made in the amount allowed as profit, but the profit should never be less than 50 cents per shell. If the actual cost should be less than the estimate the profit was to be increased, but should never exceed $1.50 per shell.
On August 31, 1918, when the entire contract should have been completed under the terms of the contract, plaintiff had manufactured only 30,000 complete rounds of shells.
As the result of numerous conferences between plaintiff and representatives of the Ordnance Department, and at the suggestion of plaintiff, a supplemental contract was entered into on November 1, 1918, whereby the original contract was converted into a fixed-price contract, under the terms of *14 which plaintiff agreed to manufacture said shells at a unit price of $8.50. Plaintiff was to furnish all material and components necessary for their manufacture and any materials or component parts which had theretofore been furnished by the United States were to be paid for by plaintiff. The schedule of deliveries was also changed. Except as modified by said supplemental contract all the terms and conditions of the original contract of December 31, 1917, were to remain in full force and effect.
The signing of the armistice rendered unnecessary the manufacture of the remaining shells covered by this contract, and the Government desired to terminate the contract. After certain negotiations plaintiff submitted a proposal that it be permitted to complete 2,500,000 rounds, to be delivered to the United States by February 1, 1919, to be paid for at the rate of $8.50 per round, the United States to be permitted to furnish plaintiff certain component parts for which plaintiff was to pay a stipulated price, same to be deducted from the unit price of $8.50 per round. This proposal was accepted and the second supplemental contract was executed, bearing date of February 1, 1919.
Under the terms of this contract the United States paid plaintiff $8.50 each for 2,500,000 complete rounds of shells, less deductions for material delivered by the United States and less 60 cents pér shell for shells accepted which were not loaded. The Government also paid plaintiff for all materials and components which plaintiff had on hand.
On June 30,1919, plaintiff presented a claim to the proper ordnance claims board alleging its right to additional compensation growing out of extra costs on account of changes in the sum of approximately $2,500,000, which was disallowed in its entirety by the Secretary of War on March 22, 1921. No further steps were taken by plaintiff in the prosecution of its claim for more than four years. The subsequent history of the transactions between plaintiff and the Government is interesting, and we believe sufficiently important to justify a brief recital thereof. In this connection it should be stated that prior to the actual execution of the original contract, to wit, on December 19, 1917, the Government loaned to plaintiff the sum of $4,908,000 to be repaid *15 by deducting from time to time a certain percentage from amounts otherwise due plaintiff. Defendant has asserted a counterclaim in this action asking for the recovery of $766,-291.94, as an unsatisfied balance on said note. In its petition plaintiff acknowledges liability on account of said balance, and it has requested the court to find as a fact' that “ at all of the conferences had between plaintiff’s representatives and the Government’s representatives in reference to the settlements in the amounts sued on in this action plaintiff’s representatives stated that plaintiff owed the Government the sum of $766,291.94, and that plaintiff stood ready and willing to pay said amount when plaintiff’s claim was settled.” This does not appear to be in accord with the facts. On May 10, 1920, by a clear mistake the $4,908,000 note was marked “ canceled ” by the Government and was returned to plaintiff. Plaintiff knew as early as December 31, 1921, that the account which involved the note transaction was “ still open.” On this date plaintiff’s munitions books were closed and the indebtedness on the note was transferred to plaintiff’s “ general ledger ” where it was thereafter carried as a “ bill payable,” the name of the payee not being stated. This information was not brought to the attention of the Government. The Government was left under the impression that the note had been satisfied by the application of credits as provided in the contract. In 1922, 1923, and again in 1924 representatives of the Government were sent to audit plaintiff’s war contracts. After the audit in 1923 plaintiff paid to the Government the sum of $40,-651.80, under the contract here involved, and other contracts; and also after the War Department audit in 1924 plaintiff paid the Government a further sum of $44,673.28. On neither of these occasions did plaintiff assert that it had a claim against the Government in any sum, nor was the attention of the representatives of the Government called to the fact that plaintiff was indebted to the Government in the further sum of $766,291.94 carried on its books as an unpaid balance of the note.
[In January, 1925, the Department of Justice again requested the plaintiff to permit a further examination of the books relative to the war-time transactions with the plain *16 tiff company. In reply the plaintiff’s attorney under date of January 17, 1925, called attention to the two prior audits mentioned above, which, as he stated, he had been informed by the auditors were final, and protested that another audit by the Government was unnecessary and “ will cause needless expense to the Government, as well as considerable trouble to the American Can Company,” but added: “ If it appears that any errors have been made in any of these settlements, the American Can Company is willing and desirous that such errors should be corrected, * * * ”; and it was suggested that the defendant’s representatives “ specify in what particular any settlements or contract or item relating to the same appears to be in error,” adding, that thereupon the plaintiff would be glad to submit its data with relation thereto.] [1] No mention whatever was made in this letter of any claim by plaintiff against the Government nor of the unpaid balance owing by plaintiff on the note. Subsequently, on February IB, 1925, plaintiff consented to the request for an examination of the books, and for the first time since the disallowance of plaintiff’s claim by the Secretary of War in 1921 the question of a claim by plaintiff was raised. On that point the letter stated: “ Several years ago the American Can Company filed claims against the United States amounting to over two and one-half million dollars arising out of performance of its large contract with the United States for shells, the settlement of which is one of those you now seek to audit. After extensive hearings these claims were rejected on technical grounds by the claims board of the War Department. These claims are still alive and may yet be 'prosecuted in court, and we submit that * * * you should certainly include in your investigation an examination of these claims, and we request that you do so.” (Our italics.) This letter contained no reference to any unpaid balance on the contract note, and as will be observed from the foregoing excerpt, there was no positive assertion of a claim against the Government, but merely a suggestion that “ these claims are still alive, and may yet be *17 prosecuted in the court.” The was unpaid balance on the note was discovered. The Government made demand for its payment on May 27, 1925. Plaintiff, by letter, dated May 29, 1925, requested a conference with the Attorney General, which was granted.. While the item of the balance on the note was mentioned in this letter, plaintiff did not acknowledge liability on account of same. The conference with the Attorney General was-held on June 8, 1925, at which conference plaintiff requested thirty days for fivrther consideration of the matter of the-claims, which was granted. This suit was filed a few days later.
It is therefore manifest that until the discovery Government of the unpaid balance on the note there had been no such frank disclosure by plaintiff of the existence-of such balance as would be inferred from the requested findings of fact hereinabove set forth, although plaintiff was in possession of exact information on the subject certainly as early as December, 1921. In fact, it is inconceivable, we think, that plaintiff did not know at all times that the note transaction was being carried on its books as an open account, showing an unsatisfied balance. It should be-remembered that the discovery of said balance could not be obtained from an examination of plaintiff’s general ledger.
In its petition plaintiff asks for a recovery of $2,638,258.20 for extra costs due to changes in the contract, less the sum of $766,291.94, the unpaid balance of the loan, the net amount being $1,871,966.26. . In its brief, however, its claim is set forth as follows:
(1) Excessive wastage of forgings due to inferior steel— $112,224. 03
(2) Excessive labor costs of making shell bodies- 203,240. 72'
(3) Extra costs of routing and handling- 483, 848.43-
(4) Extra costs of code marking- 76,063.50-
(5) Cost of lacquering, etc_ 23,872.26-
Total extra costs due to such changes- 989,248. 94
Deducting the amount admittedly due on the loan,. $766,291.94, from the above total, leaves the sum of $222,957.00 now claimed by plaintiff for extra costs due to changes, as against $1,871,966.26 claimed in its petition, and! *18 approximately $2,500,000 in the claim filed with the claims board in 1921.
The first supplemental contract of November, 1918, changed the contract from a cost-plus to a fixed-price contract, the fixed price being $8.50 per shell. Plaintiff contends that a proper construction of the contract, as amended, would require the payment of the $8.50 per shell, plus or minus the increased or decreased cost occasioned by the changes. Defendant contends that the contract as supplemented by the agreements of November 1, 1918, and February 1, 1919, definitely fixed the price to be paid at $8.50 per shell. The changes upon which this suit is based were made prior to the date of the fixed-price contract, and the second supplemental contract of February 1, 1919, and it is defendant’s further contention that the matters involved in this controversy were intended to be, and were, settled under the terms of the fixed-price contract and the subsequent supplemental contract of February 1, 1919. Special attention should here be directed to article 1 of the latter contract which provides as follows:
“Artigle 1. The contractor shall deliver and the United States shall accept the following specified quantities of the articles contracted for at the prices provided in the original contract as amended, payment of which prices shall be accepted by the said contractor in full satisfaction of any and all claims arising out of the said omginal contract as hereby amended.” (Our italics.)
It will be remembered that the Government at this time desired to terminate the contract on account of the cessation of hostilities, and plaintiff, having expended considerable sums for material then on hand and in certain operations on shells then in process of manufacture, desired to continue with the contract, and made a proposal to the Government that it be permitted to complete the manufacture of at least 2,500,000 of the 4,000,000 shells under contract. The Government acceded to this proposal, and the contract was entered into by the plain terms of which plaintiff was to make 2,500,000, at $8.50 per shell. The language used in the provision above quoted is plain and unequivocal, and appears *19 to be a complete release of all claims arising from the operations under the original contract and the amendments thereto, and that was the position taken by the War Department in disallowing plaintiff’s claim in 1921. However this may be, with our view of this case on the question of the proof adduced by plaintiff as to the cost of changes it will not be necessary to determine these issues. Plaintiff kept no record whatever of the extra costs occasioned by reason of the alleged changes it was required to make in the performance of the contract and offered no direct evidence on that point. The evidence offered consisted of the testimony of a certified public accountant, and was based upon a comparison of the cost of performance under the contract here involved and the cost of performance under a certain other contract which was for the manufacture of shrapnel (not shell) performed at a different period. Only a part of the operations in the performance of the shrapnel contract were similar to certain of the operations in the performance of the shell contract. The evidence on this point has been examined with great care. Yfithout questioning the integrity or the technical skill of the witness who presented the testimony upon which plaintiff’s claim for extra costs rests, the evidence is unsatisfactory and wholly unconvincing. Evidence of this precise character was condemned in an opinion of this court in the case of Converse et al. v. United States, 61 C. Cls. 672. Certiorari in this case was denied. An examination of the record- in the Converse ease discloses that in that case as in this an effort was made to prove excess costs by a comparison with the costs of certain work performed under another contract.
For the reasons hereinabove set forth the court is of the opinion that plaintiff is not entitled to recover herein, and the petition will, therefore, be dismissed.
Defendant is entitled to recover on its counterclaim the sum of $766,291.94, with interest from September 22, 1919, and it is so adjudged and ordered.
Sinnott, Judge; Green, Judge; Graham, Judge; and Booth, Chief Justice, concur.

 Matter in brackets substituted as of May 6, 1929, by order of court June 2, 1930.